IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 30, 2019 Session

**STATE OF TENNESSEE v. BENJAMIN FOUST**

**Appeal from the Criminal Court for Knox County
No. 98837B  G. Scott Green, Judge**

_____

**No. E2017-02420-CCA-R3-CD**

_____

The Defendant, Benjamin Foust, was convicted of ten counts of felony murder, two counts of first degree premeditated murder, four counts of especially aggravated robbery, two counts of aggravated arson, and two counts of possession of a firearm while having a prior felony conviction involving the use of violence or force.  The trial court's merger of the various convictions resulted in two felony murder convictions, two especially aggravated robbery convictions, one aggravated arson conviction, and one firearm conviction.  The trial court imposed an effective sentence of two consecutive terms of life imprisonment plus 105 years.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in failing to grant the Defendant's motion to sever or bifurcate the firearm charges; (3) the trial court erred in admitting evidence of the Defendant's drug use; (4) the trial court improperly admitted several autopsy photographs; (5) the trial court provided an improper answer to a question from the jury posed during deliberations; and (6) the trial court erred in sentencing the Defendant.  We conclude that the trial court erred in ordering the parties to stipulate to the Defendant's prior felony convictions and that the error was not harmless as to the firearm convictions.  Accordingly, we reverse the Defendant's firearm convictions and remand for a new trial as to those convictions.  We otherwise affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part and Reversed in Part; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Wesley D. Stone, Knoxville, Tennessee, for the appellant, Benjamin Foust.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendant and his co-defendants, Ashlie Tanner and Teddie Jones, were indicted for numerous offenses arising from the murders of Eric and Dena Marsh on August 16, 2011. Following the Defendant's initial trial, he was convicted of ten counts of felony murder, two counts of first degree premeditated murder, four counts of especially aggravated robbery, three counts of aggravated arson, and two counts of possession of a firearm while having a prior felony conviction involving the use of violence or force. The trial court imposed an effective sentence of two consecutive life sentences plus 105 years.

At the Defendant's initial trial, Ms. Tanner testified for the State, while Mr. Jones testified for the defense. *See State v. Foust*, 482 S.W.3d 20, 29-35 (Tenn. Crim. App. 2015). On direct appeal, this court held that the trial court committed reversible error by allowing the State to introduce, as substantive evidence, Mr. Jones's prior statement to the police in its entirety. *Id.* at 36-42. As a result, this court reversed the Defendant's convictions and remanded for a new trial. *Id.* This court also held that the evidence was insufficient to support one of the aggravated arson convictions and dismissed the charge. *Id.* at 42-44.

At the retrial, the State presented evidence that Mr. Jones, who was Mr. Marsh's stepson from a previous marriage, had been stealing from the victims. At the Defendant's original trial, the State presented the evidence through the testimony of Mr. Philip Lanteri, Mr. Marsh's stepfather. However, Mr. Lanteri passed away before the retrial, and his prior testimony was read into evidence by his wife, Mrs. Linda Lanteri. According to Mr. Lanteri, Mr. Jones previously had taken Mr. Marsh's pain pills that had been prescribed to Mr. Marsh as a result of multiple shoulder surgeries, as well as jewelry and other items of value. Mr. Marsh had called the police of several occasions to report Mr. Jones's thefts. As a result, Mr. Marsh purchased a safe, which he kept bolted to the floor of his bedroom closet, and rented a safety deposit box at a bank. Mr. Lanteri was "sure" that Mr. Marsh kept jewelry and pain pills in the safe. On cross-examination, Mr. Lanteri acknowledged that he did not know what items were in the safe. He stated that Mr. Marsh kept a certain amount of pills at his home and stored the rest in the safety deposit box.

- 2 -

At approximately 7:30 p.m. on the evening of August 16, 2011, Mr. Robert Cowles, the minister of the church where the victims attended, visited the victims at their home. Mr. Cowles testified that Mr. Marsh had undergone surgery recently and was not at church the previous Sunday. Mr. Cowles stated that Mr. Marsh's arm was in a sling and that he was uncomfortable and in pain. Mr. Cowles noticed tall bottles of prescription pills in the victims' living room. During the visit, Mrs. Marsh went into the back bedroom to lie down, and Mr. Cowles continued to speak with Mr. Marsh. Mr. Cowles left the victims' home at approximately 8:15 p.m.

Later that evening, Mr. James Morsch, a retired member of the City of Knoxville Fire Department, was driving in the area of the victims' home when he smelled smoke. He saw that the back side of the victims' home was on fire and that the flames were approximately twenty-five to thirty feet tall. Mr. Morsch parked in front of the home. Another man, who was speaking on his cell phone, arrived and confirmed to Mr. Morsch that he was speaking to a 9-1-1 operator. Records established that the first call regarding the fire was made to 9-1-1 at 9:10 p.m.

Two or three people approached Mr. Morsch and reported that one of the home's residents was unaccounted for and would not have been able to exit without assistance. Mr. Morsch saw a vehicle parked in the front yard of the victims' home. He tried to open the front door of the home, but it was locked. He beat on the front door and screamed, but he did not hear anything from inside the home. After someone kicked the door open, Mr. Morsch tried to crawl into the home but was unable to do so due to the smoke and heat from the fire. Emergency personnel arrived and discovered the victims' bodies inside the home.

Investigator Travis Kincaid, a criminal investigator with the Knoxville Fire Department who specialized in arson investigations, responded to the scene. He testified that the "fully involved" fire, where the fire was coming out from the back, the eaves, and all areas of the house, roused his suspicion because "that's not a normal or natural fire progression." He stated that as a result, he suspected that someone had set the fire using an accelerant. After the area was safe, Investigator Kincaid brought in a dog trained to alert to areas of ignitable liquid, and he collected the evidence to which the dog alerted.

Ms. Danielle Wieberg, a crime scene technician for the Knoxville Police Department, responded to the scene, arriving at around 9:30 p.m. Firefighters discovered the body of a man, later identified as Mr. Marsh, in the living room and brought him outside. Ms. Wieberg was allowed to enter the home once it was cleared and observed a portion of the ceiling, insulation, and debris on the floor.

Firefighters located a female victim, later identified as Mrs. Marsh, in the back bedroom. Also in the back bedroom were a shotgun, a hammer, a red purse, and the remains of a pillowcase containing multiple pill bottles. Although presumptive tests failed to indicate the presence of blood on the hammer, Special Agent Keith Proctor of the Tennessee Bureau of Investigation ("TBI"), a forensic scientist who the trial court accepted as an expert if forensic biology, testified that extreme temperatures resulting from a fire can destroy DNA. Ms. Wieberg noted that a puddle of lighter fluid was located inside the house. She also found a roofing hatchet with blood on the mallet lying on top of a purse near the kitchen door. The purse contained two empty pill bottles. Later testing revealed Mr. Marsh's DNA on the roofing hatchet.

Ms. Wieberg testified regarding the areas of blood found throughout the house and was accepted by the trial court as an expert in bloodstain pattern analysis. She was unable to conduct a complete analysis of the crime scene due to the damage caused by the water used to extinguish the fire. She observed a small grouping of blood droplets on the side of a kitchen cabinet. She stated that the blood droplets were spherical in nature, which indicated that they hit the surface at almost a ninety-degree angle. She noted that the droplets were located near the top of the cabinet and that it was unlikely that the victim or assailant was tall enough to account for the droplets. Rather, she believed the location of the droplets indicated that they were the result of cast-off, which occurs when blood accumulates on an object used to strike a victim and is subsequently shaken off the object onto another surface. She stated that at least two blows are required to obtain cast-off, one to break the skin and cause bleeding so that the blood gets on the weapon and another during which the blood hits the surface while the weapon is swung.

Ms. Wieberg observed a large quantity of blood that she described as "flow from gravitational" on the same side of the cabinet. She testified that the blood pattern indicated that a bloody object was against the surface. She stated that someone who was wounded possibly leaned against the cabinet and that blood ran down the cabinet as a result. She noted that the object hit the cabinet hard enough to cause impact spatter and stated that blood could have been dripping down from the portion of the bloody object that was not in contact with the cabinet.

Ms. Wieberg observed blood spatter on the front of the kitchen cabinet that struck the cabinet at a downward angle. She stated that the blood could have been from an injured victim or the result of cast-off from a weapon. She also stated that the assailant would have been swinging the weapon toward the cabinet. She observed blood on a wall outside the kitchen, which she believed was either cast-off from a weapon or from an injured victim moving through the area.

- 4 -

Ms. Wieberg testified that a large quantity of blood was in a chair and a t-shirt tied around the chair, which indicated that someone who was bleeding either sat in the chair or leaned against it. She also noted droplets of blood in the chair. She said some of the blood stains could not be clearly explained and could have resulted from "the chaotic movement of the injured victim through a crime scene." She observed a quantity of blood spatter along the entertainment center in the back bedroom. She was unable to conduct a complete analysis of the spatter and stated that it could have resulted from a bleeding victim's movement through the area. She observed blood on a large blue comforter, a pair of shorts, a shoe, and a pair of eyeglasses that were found near Mr. Marsh in the living room. A cane also was recovered near Mr. Marsh.

The victims' home included a basement, and the only access to the basement was through an entrance outside the home. Ms. Wieberg observed blood in different areas of the basement, including a quantity of blood near a table with tools on it. On cross-examination, she testified that based on the extent of Mr. Marsh's injuries, she believed that he was attacked first in the basement and then again upstairs.

Ms. Ashlie Tanner testified that she had been charged in connection with the case and that the State offered her a plea deal in which she would plead guilty to two counts of facilitation of felony murder and would receive a sentence of twenty-five years at thirty percent in exchange for her truthful testimony. Her charges of especially aggravated robbery and aggravated arson also would be dismissed.

Ms. Tanner testified that she met the Defendant in October 2010 and was in a relationship with him at the time of the offenses. They shared a house with the Defendant's mother and owned a green Ford Explorer. Ms. Tanner met Mr. Jones at the end of 2009, and they would "get high together." She said that she and Mr. Jones used cocaine and pain pills and that they had used them on the day of the offenses. She stated that the Defendant also abused pain pills and that he used them on the evening following the offenses.

Ms. Tanner testified that during the afternoon of August 16, 2011, Mr. Jones helped the Defendant repair the Defendant's mother's vehicle at the Defendant's home. Ms. Tanner remained on the porch and did not hear any conversations between the Defendant and Mr. Jones. Mr. Jones asked the Defendant and Ms. Tanner to take him back to his apartment and stated that on the way, they could stop somewhere to obtain tools to use in repairing the vehicle later. The Defendant drove the Explorer; Ms. Tanner sat in the front passenger seat; and Mr. Jones sat behind her. They first stopped at a convenience store where Mr. Jones removed the tags from the Explorer and replaced them with temporary tags while the Defendant was inside the store. They then went to the victims' home.

Ms. Tanner testified that she had not been the victims' home previously and that she believed the purpose of the visit was to retrieve tools. Mr. Jones exited the Explorer and entered the house through the front door while the Defendant and Ms. Tanner remained inside the vehicle. The Defendant asked Ms. Tanner to switch seats with him because she usually drove the vehicle. Mr. Jones then came out of the house through either the side door or the back door and motioned for them to enter the house. Ms. Tanner and the Defendant followed Mr. Jones inside the victims' house, and Ms. Tanner did not recall the Defendant saying anything to her as they were entering the house.

Ms. Tanner testified that the Defendant and Mr. Jones walked toward the kitchen while she searched for a bathroom so that she could "shoot up" pills. While in the bathroom, she heard a gurgling noise coming from the next bedroom. She went into the bedroom, where she saw Mrs. Marsh lying on the floor with a head injury. Ms. Tanner told Mrs. Marsh that she would get help. Mr. Jones then entered the bedroom, followed by the Defendant, and Mr. Jones hit Mrs. Marsh "again." Mr. Jones gave a pillowcase to Ms. Tanner and instructed her to put everything in a nearby drawer into the pillowcase. Mr. Jones and the Defendant then left the room.

Ms. Tanner put papers and pill bottles from the drawer into the pillowcase, set the pillowcase on the bed, and left the room. She saw Mr. Marsh come around the corner. He was disoriented and bleeding from a head injury. Mr. Jones came up behind Mr. Marsh and began hitting him "again." Ms. Tanner did not see the Defendant at that time. Ms. Tanner turned away, and when she turned back around, she saw Mr. Jones cover Mr. Marsh with a blanket while the Defendant stood beside Mr. Jones.

Ms. Tanner stated she left the house and got into the driver's seat of the Explorer. The Defendant then came out of the house, followed by Mr. Jones. Mr. Jones instructed her to drive through the yard and to his apartment, and she complied. While en route, Mr. Jones stated that he had left a purse and a hammer inside the house.

Ms. Tanner said that she did not recall carrying any property out of the house or seeing the Defendant or Mr. Jones carrying any property out of the house. She stated that a safe and jewelry were removed from the home but that she did not recall who removed them. She later testified that the Defendant carried the safe out of the house and placed it in the vehicle. While at Mr. Jones's apartment, the Defendant and Mr. Jones used a tire iron to open the safe, and the Defendant cut his finger as a result. Ms. Tanner only recalled the safe containing title papers. Mr. Jones instructed the Defendant and Ms. Tanner to throw the safe into a nearby pond. Mr. Jones also instructed Ms. Tanner to take the jewelry with her so they could pawn it later.

Ms. Tanner denied seeing the shotgun until she was arrested and stated that she did not see who removed the shotgun from the victims' house. She testified that on the day following the offenses, she learned that once she and the Defendant returned home after the offenses, the Defendant removed the shotgun from their vehicle and hid it underneath a broken-down Winnebago in the backyard. The Defendant also removed the safe that they had opened, as well as a second safe taken from the victims' house, and placed them on the back porch. Ms. Tanner and the Defendant then went to a grocery store where they purchased various items, including bandages for the Defendant's finger and bleach to clean the blood off one of the safes. The State presented the receipt for the purchases that was dated August 16, 2011, at 10:34 p.m., and a video recording of the Defendant and Ms. Tanner at the grocery store. They returned home, cleaned the safe, bandaged the Defendant's finger, and went to bed.

The following day, the Defendant and Ms. Tanner placed the safes into a dumpster, and Ms. Tanner threw away jewelry boxes that had contained Mrs. Marsh's jewelry. Ms. Tanner did not recall what she did with the jewelry. The Defendant retrieved the shotgun from underneath the Winnebago, told Ms. Tanner that they were selling the shotgun to a friend, and placed it in the back of their vehicle. While en route to sell the shotgun, they noticed a police officer in a vehicle behind them, and the Defendant instructed Ms. Tanner, who was driving, to go faster. Ms. Tanner drove into a parking lot where she and the Defendant were arrested. Ms. Tanner testified that she initially lied to the police when she spoke to them because she did not want to get into trouble. After she was questioned further, she gave a statement to the police.

On cross-examination, Ms. Tanner agreed that when she first spoke to the police following her arrest, she did not realize that she could be charged with the offenses and did not believe she had done anything wrong. She maintained that she initially lied to the police because she was afraid and that Mr. Jones had done something to cause her to be frightened. She stated that she was "high" when she spoke to the police and when the offenses occurred and that she began taking drugs on the day of the offenses "[a]s soon as [she] got up." She said she had a strong opiate addiction at the time of the offenses. She admitted having pills in her pocket when she entered the victims' home and planning to "shoot up" the pills while in the home. She said she did not want to "shoot up" in the Defendant's presence because he did not approve of it. While in custody, Ms. Tanner led her family to believe that she was pregnant even though she was not.

Ms. Tanner testified that Mr. Jones did not tell her or the Defendant why he wanted to go to the victims' house. She stated that the green Explorer had a red door and agreed it was odd to change the tags on the Explorer given its unique appearance. She acknowledged that she did not know what Mr. Jones was going to do until she saw him strike Mr. Marsh and that Mr. Jones, not the Defendant, gave her instructions. Ms.

Tanner testified that Mr. Jones was angry at her for leaving the pillow case in the victims' house, and she agreed that it was Mr. Jones's idea to dispose of the property.

Ms. Tanner testified that at the time of the offenses, the Defendant was enrolled in a technology school and that he was at school until 2:30 p.m. on the day after the offenses. Later that day, the Defendant and one of his friends from school worked on the Defendant's mother's car. Ms. Tanner was unaware of anyone other than Mr. Jones helping the Defendant in repairing the car on the day of the offenses.

Ms. Tanner acknowledged that she was facing a sentence of 102 years on the original charges and that based upon her agreement with the State, she was eligible for parole in 2018. She also acknowledged that when she received the offer from the State, she was charged in unrelated cases with criminal impersonation, possession of drug paraphernalia, simple possession of drugs, shoplifting, theft, and multiple worthless check charges. She admitted that all of the charges were dismissed and that the dismissals were a benefit received as a result of her negotiations with the State. On redirect examination, Ms. Tanner testified that she has previously been denied parole and that she did not know whether she would be granted parole in 2018. She said she was testifying so that the victims' families could obtain "some closure."

Officer Philip Jinks of the Knoxville Police Department assisted in the search for the Defendant and Ms. Tanner following the offenses. Officers were searching for a Ford Explorer with a passenger door that was a different color than the rest of the vehicle. Officer Jinks testified that he began watching the home of the Defendant and Ms. Tanner after he saw the Explorer parked there. A few minutes later, he saw two people who matched the descriptions of the Defendant and Ms. Tanner exit the house and get into the Explorer. Officer Jinks was in an unmarked car, and he requested a marked car to assist in a traffic stop. Officer Jinks followed the Explorer to the parking lot of a shopping center. The marked unit then pulled behind the Explorer with its blue lights activated. Officer Jinks looked in the back of the Explorer and saw what appeared to be a shotgun partially covered with a blanket. He notified other officers that a gun was inside the vehicle. The Defendant and Ms. Tanner were transported to the police station, and the vehicle was towed to an impound lot.

Officers executed a search warrant of the Explorer and found a Remington Wingmaster Model 870 12-gauge shotgun in the backseat. Mr. Lanteri testified that he gave the shotgun to Mr. Marsh after Mr. Marsh loaned him money. The Defendant's fingerprints were found on the shotgun. Officers also executed a search warrant at the home of the Defendant and Ms. Tanner and located jewelry boxes and jewelry, which were identified at trial as belonging to Mrs. Marsh. Officers executed a search warrant of

Mr. Jones's apartment and searched a nearby dumpster, and they recovered clothing, shoes, and two containers of Clorox from the dumpster.

TBI Special Agent Laura Hodge, who the trial court accepted as an expert in microanalysis, tested various samples from the victims' home, the Defendant's Explorer, clothing found at Mr. Jones's apartment, and clothing found in the dumpster for accelerants. Testing of samples from the back door and the hallway of the victims' home revealed the presence of an isoparaffin product, an ignitable liquid found in some charcoal starters, copier fluids, aviation gasolines, lamp oils, insecticides, polishes, and camping fuels. Testing of a white bottle from the driver's floor of the Defendant's Explorer and a yellow left Puma shoe recovered from the dumpster revealed the presence of a medium petroleum distillate, an ignitable liquid found in some mineral spirits, paint thinners, charcoal starters, dry cleaning solvents, torch fuels, insecticides, polishes, and lamp oils.

Special Agent Proctor examined a pair of jeans found in the dumpster and stated that presumptive testing indicated the presence of blood. One of the stains on the jeans had a DNA profile of a mixture of genetic material with Mr. Marsh as the major contributor and Mr. Jones as the minor contributor at six locations. The remaining locations were inconclusive due to insufficient or degraded DNA. Testing of the waistband of the jeans for touch DNA revealed a partial profile that was consistent with Mr. Jones's profile at two locations. Special Agent Keith Proctor testified that the results were consistent with Mr. Jones's wearing the jeans at some point. Testing of a right Puma shoe recovered from the dumpster revealed a DNA profile containing a mixture of genetic material from at least two individuals with Mr. Jones as the major contributor. Special Agent Proctor stated that the results of the testing were consistent with Mr. Jones's wearing the shoe at some point.

Dr. Christopher Lochmuller, the Chief Deputy Medical Examiner for Knox County, was accepted by the trial court as an expert in forensic pathology, anatomic pathology, and clinical pathology. He performed the autopsies of both victims. He testified that Mr. Marsh sustained twelve blows to his head. One blow resulted in a depressed skull fracture on the top left side of Mr. Marsh's head, and another blow on the left side of his forehead resulted in a complex fracture that spread across the skull and intersected with the depressed skull fracture. Dr. Lochmuller stated that the blow resulting in the depressed skull fracture occurred before the blow to the forehead. Dr. Lochmuller was unable to determine the sequence in which the other blows occurred. Mr. Marsh had hemorrhaging overlying his brain and bruising of his brain. Mr. Marsh also sustained an injury to the left side of his neck and had defensive wounds on his right hand and right forearm.

Dr. Lochmuller testified that Mr. Marsh inhaled soot from his nose and mouth and into his lungs and had a "substantially high level" of carbon monoxide in his blood. Dr. Lochmuller determined that not only was Mr. Marsh alive at the time of the fire, the level of carbon monoxide in his blood was at such a level that it was "a significant contribution to his death." Dr. Lochmuller testified that the injury to Mr. Marsh's head was independently fatal and that the extent of his carbon monoxide exposure "by itself could be lethal." Dr. Lochmuller concluded that Mr. Marsh's death was the result of blunt force injuries and carbon monoxide inhalation and that his manner of death was homicide.

Dr. Lochmuller testified that Mrs. Marsh sustained five separate blows to her head, one to the back of her head and four to her left temple. The blows of her left temple resulted in a large depressed skull fracture, and the blow to the back of her head resulted in a fracture that traveled to and stopped at her depressed skull fracture. As a result, Dr. Lochmuller determined that Mrs. Marsh received the blows to her left temple before she was struck on the back of her head. There was hemorrhaging overlying her brain and bruising on her brain.

Mrs. Marsh had extensive burns covering most of her body. She also had inhaled and swallowed soot and had an "elevated" level of carbon monoxide in her blood. Dr. Lochmuller stated that Mrs. Marsh's carbon monoxide level was not as high as Mr. Marsh's level but that she had a more severe head injury. Dr. Lochmuller explained that Mrs. Marsh's head injury caused her to die more quickly than Mr. Marsh but that the carbon monoxide still contributed to her death. Dr. Lochmuller concluded that Mrs. Marsh's death was the result of blunt force injuries and carbon monoxide inhalation and that her manner of death was homicide.

Dr. Lochmuller testified that the flat end of the roofing hatchet and the flat face of the claw hammer found near Mrs. Marsh's body were consistant with the injuries of both victims. He could not determine the positions of the victims when they received the injuries.

The parties stipulated that the Defendant had "a previous felony conviction consistent with Tennessee Code Annotated [section] 39-17-1307(b)(1)(A)." The State then rested its case.

The defense sought to call Mr. Jones as a witness, but he refused to testify. The trial court found that he was unavailable, and his testimony from the Defendant's prior trial, except for the portions of his prior testimony that this court had concluded on direct appeal to be inadmissible, was read to the jury.

Mr. Jones testified that he had pled guilty to the charges related to the murders. He stated that he had known Ms. Tanner for six or seven months at the time of the offenses and that he saw her three or four times a week, during which they would inject pills together. The Defendant knew that Ms. Tanner was injecting pills but did not approve of it. The Defendant told Mr. Jones that he was jealous of the relationship between Ms. Tanner and Mr. Jones.

Mr. Jones testified that on the day of the offenses, he did not go to the Defendant's home and help him repair his mother's car. Rather, Mr. Jones stated that he called Ms. Tanner and asked her to drive him to purchase pills. He said that when Ms. Tanner arrived at his apartment, the Defendant was in the Explorer too and was extremely intoxicated. Mr. Jones stated that he had not talked to the Defendant about where they were going and that he never had a discussion with Ms. Tanner about obtaining tools.

Mr. Jones testified that when they arrived at the victims' home, only he and Ms. Tanner went inside. He maintained that the Defendant did not enter the house, did not know what was going to occur, and did not carry any items out of the house. Mr. Jones stated that Ms. Tanner was aware of the impending crimes. Mr. Jones did not recall who carried the shotgun out of the house but said he may have done so. He stated that Ms. Tanner carried the jewelry box out of the house. Mr. Jones did not recall placing a hatchet on a purse near the door and said they did not discuss the offenses while in the vehicle.

Mr. Jones testified that they returned to his apartment where the Defendant tried to help Mr. Jones open a safe. Mr. Jones said he told the Defendant that the safe belonged to him and that he had broken it. The Defendant cut his hand while trying to open the safe, "[f]lipped out," and returned to the vehicle. Mr. Jones stated that he and Ms. Tanner split pills taken from the victims' home and that Ms. Tanner took the jewelry and the shotgun so she could sell them. Mr. Jones denied that the Defendant took any of the victims' belongings with him when he left Mr. Jones's apartment.

On cross-examination, Mr. Jones testified that he was interviewed by the police following his arrest and told the officers "what they wanted to hear" after twelve hours. He recalled telling the officers that he was not in the victims' home but that the Defendant was. Mr. Jones also recalled telling the officers that he provided information about the victims to the Defendant and Ms. Tanner and that the Defendant and Ms. Tanner returned to his apartment and told him about the robberies. Mr. Jones then gave a second statement to the police admitting to being in the victims' home with Ms. Tanner and the Defendant. He said he told the officers what they "needed to hear." He did not recall telling the officers that he was afraid of the Defendant and maintained at trial that

he was not afraid of the Defendant. Mr. Jones stated that since their incarceration, he and the Defendant had two altercations, both of which Mr. Jones initiated.

On redirect examination, Mr. Jones testified that he lied to the police because he was trying to protect himself. He stated that the roofing hatchet came from one of his neighbors and that he disposed of his clothing in a nearby dumpster following the offenses.

Mr. Brent Cox testified that he had known the Defendant for four or five years at the time of the Defendant's arrest. Mr. Cox stated that he helped the Defendant in repairing his mother's car on the day prior to the Defendant's arrest. Mr. Cox said that he and the Defendant drank an excessive amount of alcohol, that he had to help the Defendant inside, and that the Defendant was passed out in a chair when Mr. Cox left the Defendant's home at 7:30 or 8:00 p.m. Mr. Cox testified that he did not see Ms. Tanner at the home that night. On cross-examination, Mr. Cox testified that he did not recall the Defendant talking on his cell phone or mentioning Mr. Jones that night. Mr. Cox did not tell law enforcement that he had been with the Defendant, explaining that he did not believe that the information "would amount to anything."

In rebuttal, the State introduced the Defendant's cell phone records for the day of the offenses. The records reflected multiple incoming and outgoing calls between 3:16 p.m. and 8:13 p.m. that day. An outgoing call at 8:13 p.m. lasted 343 seconds. At 8:53 p.m., there was an incoming call that went to the Defendant's voicemail. The next call was an incoming call at 9:57 p.m. Mr. Joseph Trawicki, the records custodian for Sprint, acknowledged that he could not determine who was using the Defendant's cell phone from his records.

With respect to the offenses committed against Mrs. Marsh, the Defendant was indicted for and convicted of felony murder "during the attempt to perpetrate" theft, felony murder "during the attempt to perpetrate" robbery, felony murder during the perpetration of theft, felony murder during the perpetration of robbery, felony murder during the perpetration of arson, first degree premeditated murder, especially aggravated robbery through violence, especially aggravated robbery through fear, and aggravated arson resulting in serious bodily injury to Mrs. Marsh. With respect to the offenses committed against Mr. Marsh, the Defendant was indicted for and convicted of felony murder "during the attempt to perpetrate" theft, felony murder during the perpetration of theft, felony murder "during the attempt to perpetrate" robbery, felony murder during the perpetration of robbery, felony murder during the perpetration of arson, first degree premeditated murder, especially aggravated robbery through fear, especially aggravated robbery through violence, and aggravated arson resulting in serious bodily injury to Mr. Marsh. The Defendant also was charged with and convicted of possession of a firearm

while having a prior felony conviction involving the use of violence and possession of a firearm while having a prior felony conviction involving the use of force.

The trial court imposed sentences of life imprisonment for each of the murder convictions. Following a sentencing hearing, the trial court sentenced the Defendant as a Range II multiple offender to forty years for each conviction of especially aggravated robbery, twenty-five years for each of the especially aggravated arson convictions, and two years for each of the firearm convictions. The trial court merged the murder convictions into two felony murder convictions, the four convictions of especially aggravated robbery into two convictions, the aggravated arson convictions, and the firearm convictions. The trial court ordered the Defendant's sentences to be served consecutively, except for his firearm conviction, for a total effective sentence of two consecutive terms of life imprisonment plus 105 years.

The Defendant filed a motion for new trial, which the trial court denied. The Defendant appeals, arguing that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in failing to grant the Defendant's motion to sever or bifurcate the firearm charges; (3) the trial court erred in admitting evidence of the Defendant's drug use; (4) the trial court improperly admitted several autopsy photographs; (5) the trial court provided an improper answer to a jury question during deliberations; and (6) the trial court erred in sentencing the Defendant.

## ANALYSIS

### I. Sufficiency

The Defendant challenges his convictions for felony murder, first degree premediated murder, especially aggravated robbery, and aggravated arson. He maintains that the evidence is insufficient to establish his guilt as either the principal offender or under a theory of criminal responsibility. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact,

not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to this case, first degree murder is the premeditated and intentional killing of another or the "killing of another committed in the perpetration of or attempt to perpetrate any … arson, … robbery, … [or] theft." T.C.A. § 39-13-202(a)(1)-(2). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. "No culpable mental state is required" of felony murder, "except the intent to commit the enumerated offenses." T.C.A. § 39-13-202(b).

A person commits arson who "knowingly damages any structure by means of a fire or explosion" and "[w]ithout the consent of all persons who have a possessory, proprietary or security interest therein." T.C.A. § 39-14-301(a)(1). As charged in the present case, aggravated arson is arson "[w]hen any person … suffers serious bodily injury as a result of the fire or explosion." T.C.A. § 39-14-302(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Theft occurs when a person, "with intent to deprive the owner of property, … knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Especially aggravated robbery is robbery that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a).

At trial, the State relied, in part, upon a theory of criminal responsibility to establish the Defendant's guilt. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of

another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

When viewed in a light most favorable to the State, the evidence presented at trial established that Mr. Jones had an acrimonious relationship with Mr. Marsh because Mr. Jones had stolen items such as prescription pills and jewelry from the victims on numerous occasions, and Mr. Marsh had contacted the police as a result. Mr. Jones was aware that Mr. Marsh kept prescription pills in his home, and all three defendants abused prescription pills.

Although Ms. Tanner generally drove the Explorer, the Defendant drove his co-defendants to the victims' home. They stopped while en route, and Mr. Jones changed the tags on the vehicle. Ms. Tanner did not see the victims when they were initially attacked. The wounded victims were still alive when Ms. Tanner saw Mr. Jones strike them repeatedly, and the Defendant was with Mr. Jones during the attacks. The Defendant made no attempt to stop Mr. Jones, render aid to the victims, or notify the authorities. Rather, the Defendant, along with his co-defendants, gathered many of the victims' belongings, including two safes, a shotgun, jewelry, and jewelry boxes. Ms. Tanner gathered pills bottles from a drawer in the bedroom but left them in the bedroom when she exited the house.

The Defendant carried one of the safes to his vehicle, and Mr. Jones exited the house shortly thereafter. The safe was kept in the victims' bedroom closet located in the back of the house. The back of the house was also the source of the fire, as demonstrated by the accelerants detected on samples taken from the back of the house, Mr. Morsch's testimony regarding his observation of flames coming from the back of the house, and the severe burns on Mrs. Marsh's body. The victims were still alive when the fire occurred,

and the fire contributed to their deaths. A bottle of accelerant was found in the Defendant's vehicle following his arrest.

The Defendant and his co-defendants fled the scene, and the Defendant assisted Mr. Jones in breaking into the safe. The Defendant participated in the concealment of the crimes. He and Ms. Tanner used bleach to clean blood off of the safe and then discarded the safe. The Defendant and the co-defendants discussed selling the jewelry. The Defendant also arranged to sell the shotgun and was en route to do so when he was arrested. His fingerprints were found on the shotgun.

The Defendant challenges the credibility of Ms. Tanner's testimony and relies upon Mr. Jones's testimony during which he denied that the Defendant participated in the offenses to argue that the evidence is insufficient to support the convictions. By its verdict, the jury chose to credit Ms. Tanner's testimony and reject Mr. Jones's testimony. Questions regarding the credibility of the witnesses are within the province of the jury and will not be revisited by this court on appeal. *Bland*, 958 S.W.2d at 659.

The Defendant maintains that when answering a question posed by the jury during deliberations, the trial court improperly instructed regarding criminal responsibility and facilitation in response to a question for the jury during deliberations and, thus, rendered the evidence insufficient. However, the question of whether the evidence is sufficient to support a conviction and the question of whether the trial court properly issued a supplemental jury instruction are two separate and distinct issues. In examining whether evidence is sufficient, this court must only determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The Defendant fails to offer any support for his assertion that an error in a jury instruction renders the evidence insufficient. Rather, we conclude that the evidence is sufficient to support the Defendant's convictions for first degree premeditated murder, felony murder, especially aggravated robbery, and aggravated arson based upon a theory of criminal responsibility. The Defendant is not entitled to relief regarding this issue.

## II. Severance/Bifurcation of Firearm Charges

The Defendant contends that the trial court erred in denying his request that his firearm charges be severed from his remaining charges or be tried in a bifurcated proceeding. He asserts that informing the jury at trial that he was a convicted felon denied him the right to a fair determination of his guilt or innocence on the other charges and that the procedure employed by the trial court was inadequate to prevent prejudice. The State responds that the trial court properly denied the Defendant's motion and that the stipulation that the Defendant had a prior felony conviction did not result in prejudice.

The State avers that "[t]he trial court specifically crafted the stipulation" to ensure that the jury did not learn that the Defendant had more than one felony conviction or that the conviction involved the use of force or violence and that the trial court instructed the jury to not consider the Defendant's prior felony conviction when rendering a verdict on the other charges.

## A. Underlying Proceedings

According to the firearm counts in the indictment, the Defendant had two prior aggravated robbery convictions and a prior aggravated burglary conviction. Prior to the Defendant's original trial, defense counsel requested that the firearm charges be tried in a bifurcated proceeding, and the trial court denied the request. *See Foust*, 482 S.W.3d at 46. Defense counsel next requested that the Defendant be allowed to only stipulate that he was a convicted felon, and the trial court rejected the request because an essential element of the firearm offenses was that the prior felony conviction involved force or violence. *Id.* Defense counsel then requested that the Defendant be allowed to stipulate that the prior felony conviction involved the use of force, but the trial court denied the request because one of the firearm counts in the indictment alleged that the prior felony conviction involved the use of violence. *Id.* At trial, the parties stipulated that the Defendant had "a previous felony conviction involving force" and "a previous felony conviction involving violence." *Id.*

On appeal, the Defendant argued that the trial court erred in not allowing him to stipulate that he had prior felony convictions without disclosing that the convictions involved force or violence. *Id.* This court noted that

> the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings and address the unlawful possession of a firearm charge separately.

*Id.* at 46-47 (citing *State v. Taft Arkey Murphy*, No. M2007-00403-CCA-R3-CD, 2008 WL 4735494 (Tenn. Crim. App. Oct. 27, 2008); *State v. Alonzo Maurice Rogan*, No. M2002-01603-CCA-R3-CD, 2004 WL 112864 (Tenn. Crim. App. Jan. 22, 2004) (both cases where trial courts bifurcated the unlawful possession of a firearm charge from the remaining charges)). Nevertheless, this court concluded that the trial court did not err in accepting the stipulation eventually agreed to by the parties. *Id.* at 47. This court held that the Defendant's proposed stipulations that he had a prior felony conviction and that he had a prior felony conviction involving force "'did not encompass the elements the State had to prove, which would have left the jury with a lack of coherence as to the

offense.'" *Id.* (quoting *State v. Marvin Senathan Hall, Jr.*, No. W2008-00933-CCA-R3-CD, 2009 WL 1643435, at *8 (Tenn. Crim. App. June 12, 2009)).

Prior to the retrial, the Defendant filed a "Motion for Severance or Bifurcation of Offenses," in which he requested that the firearm charges be heard separately from the remaining charges. During a pretrial hearing, defense counsel requested that the trial court either sever the firearm charges from the remaining counts or bifurcate the proceedings as advised by this court on direct appeal. The trial court stated that in the past, it had severed the counts if a defendant entered a guilty plea to the firearm charges "without recommendation" and stated that, as a result, the State would not be permitted to present evidence of the prior felony convictions. The trial court stated that if the Defendant was unwilling to enter a guilty plea to the firearm charges,

> the other way that we have handled this in the past is to do a stipulation that he is in violation of the specific … number of the statute. And that tells the jury that he is a convicted felon, but it doesn't go into force and violence, but he's still admitting that he meets the parameters of that part of the statute. And it satisfies the State's burden of proof.

The trial court held its ruling on the motion in abeyance. The trial court stated that if the Defendant was willing to enter guilty pleas to the firearm charges, the court would sever those counts, accept the pleas, and hold a trial on the remaining charges so that the jury would not learn that the Defendant was a convicted felon. The trial court acknowledged that the Defendant had filed a motion to suppress the firearm recovered during a search of his vehicle and that the Defendant would be unable to properly litigate and preserve the suppression issue if he pleaded guilty to the firearm charges.

During a hearing on the morning of the trial, defense counsel argued for bifurcation of the proceedings. Defense counsel noted that the Defendant had a prior aggravated robbery conviction and was charged with especially aggravated robbery. The trial court stated that the firearm charges could be tried with the other charges under the law and that a jury instruction limiting the purposes for which the jury could consider the prior convictions was available. The trial court "suggest[ed]" that rather than stating that the Defendant had a prior aggravated robbery conviction,

> [t]he Court would permit a stipulation that the parties—words to the effect that the parties stipulate that [the Defendant] has a conviction which qualifies under TCA 39-17-1307, and then list the subpart that there being a crime of violence because, obviously, that elevates it. And the State has to prove that element, because that elevates the punishment if he's found

guilty from an E felony to a C felony, based on the nature of his prior conviction.

> But what we accomplish by doing that is, the jury—they find out he's a convicted felon, but they don't find out the fact [—] the nature of the prior conviction, and I'll do that.

Defense counsel continued to object and argued that stipulating to the existence of a prior felony conviction that involves violence or fear would be prejudicial. The trial court stated, "I'm not going to make you do that. I'm going to actually list the statute number which enumerates a crime of violence." The trial court instructed the parties to "[w]ork out the language. Actually, use the statute number subpart that defines prior conviction, bodily fear, or violence, and that's all the jury's ever going to hear." The prosecutor agreed that the language regarding the prior felony conviction involving the use of violence or force would be omitted from the jury instructions and would not be mentioned when the indictment is read to the jury. When asked whether he agreed, defense counsel stated, "We stipulate that."

At trial, the parties stipulated that the Defendant "has a previous felony conviction consistent with Tennessee Code Annotated 39-17-1307(b)(1)(A)." At the conclusion of the proof, the trial court instructed the jury that the Defendant was charged in counts 20 and 21 with "the unlawful possession of a firearm by a felon previously convicted of a felony specified in T.C.A. 39-17-1307(b)(1)(A)." The trial court instructed the jury that the State had the burden of proving that (1) the Defendant "had been convicted of a prior felony"; (2) he possessed a firearm after the felony conviction; (3) he acted either intentionally, knowingly, or recklessly; and (4) "the felony involved a violation of T.C.A. 39-17-1307(b)(1)(A)."

## B. Analysis

On appeal, the Defendant challenges the procedure employed by the trial court, which allowed the jury to learn of his status as a convicted felon. The Defendant asserts that the trial court should have either severed the firearm charges from the other charges pursuant to Tennessee Rule of Criminal Procedure 14(b)(2)(A), which provides for the severance of mandatorily-joined offenses prior to trial if "appropriate to promote a fair determination of the defendant's guilt or innocence of each offense," or bifurcated the proceedings as suggested by this court on direct appeal. *See Foust*, 482 S.W.3d at 46-47.

This court stated in the initial appeal that bifurcation of the proceedings whereby the firearm charges would be addressed separately was "the better procedure" where, as here, the Defendant is charged both with offenses involving the use of violence and force

and with the status offense of unlawful possession of a firearm while having a similar prior felony conviction. *Id.* On remand, the trial court did not make any findings as to why bifurcation was improper. While this court did not specifically mandate bifurcation, we question why the trial court would risk reversal of numerous first degree murder and other Class A felony convictions by failing to heed our advice on a procedure for trying firearm charges that resulted in two-year sentences. The trial court also failed to analyze the Defendant's request for severance or make any findings based upon Rule 14 of the Tennessee Rules of Criminal Procedure.

Instead, the trial court provided the Defendant with three options: plead guilty to the firearm offenses, enter into a stipulation, or permit the State to introduce evidence regarding his prior violent felony convictions at trial. When the Defendant declined to enter a guilty plea to the firearm offenses and objected to a stipulation, the trial court instructed the parties to enter into a stipulation and told them the language to use. The trial court also amended the firearm counts in the indictment and modified the jury instructions for the firearm offenses to mirror the language in the stipulation.

A stipulation is an agreement "which is entered into mutually and voluntarily by the parties." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 701 (Tenn. Ct. App. 1999). A stipulation "binds the parties to the agreed facts and must be 'rigidly enforced' by the courts." *State v. James M. Kennedy*, No. 02C01-9207-CC-00168, 1993 WL 102002, at *1 (Tenn. Crim. App. Apr. 7, 1993) (quoting *State ex rel. Weldon v. Thomason*, 221 S.W. 491, 495 (Tenn. 1920)). However, the record must clearly show that both parties agreed to the stipulation. *Id.* (citing 73 Am. Jur. 2d Stipulations § 2 (1974)). Furthermore, "it is not the duty or function of a trial court to require one of the parties to the litigation to stipulate with his adversary," and "it is not the business of the trial judge to decide what will be stipulated." *State v. Ford*, 725 S.W.2d 689, 691 (Tenn. Crim. App. 1986).

The trial court did not merely suggest that the parties enter into a stipulation and then allow the parties to reach an agreement regarding the wording of the stipulation. Rather, the trial court's actions were tantamount to an order of the court, and the stipulation was not a result of a mutual agreement reached by the parties. The lack of mutuality to the stipulation was illustrated by the prosecutor's confusion and request for clarification from the trial court regarding its instruction, as well as defense counsel's continued objection to the procedure. As this court previously has recognized, "the danger of courts getting involved in the stipulation process is evident." *Id.* (holding that the trial court erred in requiring the defendant to present a witness's testimony through stipulation when the defendant objected to the presentation of the testimony through stipulation and the prosecutor objected to the wording of the stipulation). We conclude that the trial court erred in this regard.

We conclude that the error is harmless to the Defendant's convictions for first degree murder, especially aggravated robbery, and aggravated arson. *See id.* at 691-92 (holding that the trial court's error in requiring the defendant to enter a stipulation was harmless); *see also* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The evidence supporting these convictions was strong. The stipulation did not include the nature of the Defendant's prior felony convictions, and the jury never learned that the Defendant's prior convictions were similar to the charges for which he was on trial. The trial court also instructed the jury that it was not to consider the Defendant's prior conviction in reaching a verdict on these convictions and that the Defendant's prior conviction did not alter the presumption of innocence. The jury is presumed to follow the trial court's instructions. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006).

We, however, cannot conclude that the error was harmless with respect to the Defendant's firearm convictions. The State was required to establish that the Defendant "unlawfully possess[ed] a firearm" and had "been convicted of a felony involving the use or attempted use of force [or] violence…." T.C.A. § 39-17-1307(b)(1)(A) (2010). The only evidence presented at trial that the Defendant previously had been convicted of a felony involving the use or attempted use of force or violence was the improperly entered stipulation. Because there was no other evidence presented at trial to establish this essential element of the offenses, we conclude that the error "more probably than not" affected the judgments, and we reverse the Defendant's firearm convictions and remand for a new trial on those charges.

### III. Evidence of the Defendant's Drug Use

The Defendant contends that the trial court erred in allowing the State to present evidence of his drug use. He maintains that such evidence was not admissible as substantive proof under Tennessee Rule of Evidence 404(b). The State responds that the trial court did not err in admitting the evidence. We agree with the State.

At trial, the State sought to present evidence of the Defendant's drug use through the testimony of Ms. Tanner. During a jury-out hearing, Ms. Tanner testified that she and Mr. Jones used cocaine and pain pills, while the Defendant smoked marijuana and occasionally used pain pills. She stated that she and the Defendant had used pain pills together.

Ms. Tanner testified that they were supposed to be getting tools from the victims' home. She stated that "[a]fter we were there, I didn't know before—I mean, on the way

into the house, going to the house, I didn't know, but going in there, I figured it was a robbery." She said she believed they were going to commit a robbery once the tags on the vehicle were switched. She also said she believed they were going to take pills from the home because she, Mr. Jones, and the Defendant were addicts. She stated that she saw the Defendant swallow a pain pill on the date of the robbery and later stated that she and the Defendant took pills on the night following the offenses.

On cross-examination, Ms. Tanner agreed that she did not believe that a robbery was to occur until after she entered the house, saw Mr. Jones striking the victims, and was instructed by Mr. Jones to put items in the pillow case. The Defendant never mentioned a robbery, and no one discussed committing a robbery while en route to the victims' home. Ms. Tanner acknowledged that while en route, nothing led her to believe that a robbery was to occur.

Ms. Tanner testified that the Defendant smoked marijuana more often than he took pain pills. She said that she saw the Defendant smoke marijuana during the day prior to the offenses but that she did not see him take any pills. She was unaware of any marijuana found in the victims' home. In response to questioning by the trial court, Ms. Tanner testified that she saw the Defendant take a pill at some point on the day that the offenses occurred. On cross-examination, Ms. Tanner clarified that she saw the Defendant take a pill after the offenses occurred. She stated that both she and the Defendant possessed pills before they entered the victims' home. The Defendant did not have a prescription for the pills.

The trial court found that the Defendant's drug usage close in time to the offenses was relevant to motive, intent, and design. The trial court did not allow the State to present evidence of the Defendant's drug usage from years prior to the offenses.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) ... because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id*. (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, … common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The State concedes that the trial court failed to substantially comply with the procedural mandates of Rule 404(b), and we agree. Even though the trial court held an evidentiary hearing and found that the testimony was admissible as evidence of motive and intent, the trial court did not determine whether the Defendant's drug use was established by clear and convincing evidence or whether the danger of unfair prejudice did not outweigh the probative value of the evidence. Therefore, our standard of review is de novo. *State v. Marcus Smartt*, No. M2014-01093-CCA-R3-CD, 2015 WL 3563024, at *8 (Tenn. Crim. App. June 9, 2015) (reviewing the admission of evidence under Rule 404(b) de novo when the trial court did not make explicit findings that the evidence supporting the prior bad acts was clear and convincing or that the danger of unfair prejudice did not out outweigh the probative value of the evidence).

We agree with the trial court's finding that the Defendant's drug usage was relevant to the issue of motive and intent in light of evidence that the robberies entailed the taking of Mr. Marsh's prescription medication, which was inadvertently left at the

scene. The Defendant maintains that evidence of his drug usage was not clear and convincing because Ms. Tanner testified inconsistently regarding when he took a pain pill on the day of the offenses and when she were became aware that a robbery was to occur. However, Ms. Tanner clarified during the jury-out hearing that the Defendant took a pain pill after the offenses occurred, and her testimony regarding another aspects of the offenses does not render her testimony regarding the Defendant's drug usage inadmissible. Rather, by its ruling, the trial court implicitly credited Ms. Tanner's testimony regarding the Defendant's prior drug use, and we, thus, conclude that the evidence of the Defendant's drug usage was clear and convincing. We also conclude that the probative value of the testimony was not outweighed by the danger of unfair prejudice. Therefore, the trial court properly admitted the evidence.

## IV. Autopsy Photographs

The Defendant challenges the admission of autopsy photographs of the victims' head injuries. He maintains that the photographs were unfairly prejudicial due to their gruesome nature and were cumulative to Dr. Lochmuller's testimony and his use of Styrofoam heads to demonstrate the locations of the victims' head injuries. The State responds that the trial court did not abuse its discretion in admitting the photographs. We agree with the State.

Prior to trial, the Defendant filed a motion to exclude numerous photographs from the autopsy. During a jury-out hearing prior to Dr. Lochmuller's testimony at trial, Dr. Lochmuller testified regarding each autopsy photograph that the State sought to admit. The trial court issued rulings on each individual photograph and admitted all but one photograph. The trial court excluded a photograph of Mrs. Marsh's head injuries as graphic and unfairly prejudicial.

The admissibility of photographs lies within the trial court's sound discretion, and this court will not disturb a trial court's ruling on admissibility absent a showing of an abuse of that discretion. *State v. Willis*, 496 S.W.3d 653, 726 (Tenn. 2016). This court "must confine itself to determining whether the trial court's decision was within the range of acceptable alternatives." *Id.* at 729. This court "should permit a trial court's discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *Id.*

There is a general policy of liberality in the admission of photographic evidence. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). To be admissible, evidence must satisfy the threshold determination of relevancy set forth in Tennessee Rule of Evidence 401. *See id.* Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Evidence is "unfairly prejudicial" if it has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Willis*, 496 S.W.3d at 726 (quoting *Banks*, 564 S.W.2d at 951).

Photographs of a murder victim may be admissible even though the photographs are of a "'gruesome and horrifying character.'" *State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016) (quoting *Banks*, 564 S.W.2d at 950-51). Factors to be considered in determining the admissibility of photographs of a murder victim include

> the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* The trial court may consider "the grotesque and horrifying nature" of the charges in determining whether any prejudice to the defendant is unfair. *Willis*, 496 S.W.3d at 729 (stating that to the extent that the photographs tended to be shocking or gruesome, it was because the crime depicted was of the sort). Our supreme court has recognized "'the superior position of the trial court for balancing the probative value and prejudicial effect'" of photographs on the jury. *Id.* (quoting *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. 1987)).

The Defendant challenges the admission of five photographs of Mr. Marsh's head depicting a number of lacerations and their locations. During the jury-out hearing, Dr. Lochmuller testified that because Mr. Marsh had twelve separate impact sites spread over his head, the lacerations could not be shown in a single photograph. The Defendant also challenges a photograph of a laceration on the back of Mrs. Marsh's head and a photograph of four lacerations in the area of Mrs. Marsh's left temple. The trial court admitted the photograph of the back of Mrs. Marsh's head after the State agreed to crop out portion of the photograph depicting Mrs. Marsh's forearms and back.

The photographs were relevant to establish the nature and extent of the victims' injuries and to the issues of premeditation and intent. Our supreme court has recognized

- 25 -

that post-mortem photographs may be relevant to show how the victim died and the nature of the injuries inflicted before death, as well as to the issues of premeditation and intent. *See Davidson*, 509 S.W.3d at 199. "'[T]he succession of blows, the patently vicious manner of their infliction, the enormity of the cruelty and the horrendous injuries suffered provide … evidence of a willful execution of an intent to kill.'" *Banks*, 564 S.W.2d at 951 (quoting *State v. LaChance*, 524 S.W.2d 933, 937-39 (Tenn. 1975), *abrogated on other grounds by State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992)). Dr. Lochmuller used the photographs at trial to describe how the victims died, and the photographs show the repeated blunt force trauma endured by the victims and the severity of their wounds.

The Defendant argues that the photographs were cumulative to other evidence presented at trial, including Dr. Lochmuller's testimony, his autopsy reports, and his use of Styrofoam heads to show the locations of the injuries. While the autopsy reports stated that the victims had lacerations to their heads and the marks on the Styrofoam heads illustrated the location of those lacerations, the photographs depicted the nature and severity of those injuries. Furthermore, "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *Willis*, 496 S.W.3d at 728 (quotations omitted). While the photographs were graphic, they were not unnecessarily gruesome or horrifying given the facts and circumstances of the case. We conclude that the photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court properly exercised its discretion in admitting the photographs.

## V. Response to Question from the Jury

The Defendant contends that the trial court employed an improper procedure in responding to a question posed by the jury during deliberations about criminal responsibility and facilitation. He also contends that the trial court's response to the question failed to submit the legal issues to the jury and misled the jury as to the applicable law. The State maintains that the trial court's response to the jury question fairly and accurately set forth the applicable law and that the trial court's failure to employ the correct procedure in responding to the question was harmless. We agree with the State.

During deliberations, the jury submitted the following question: "Can a defendant be convicted of 1st degree premeditated murder based on criminal responsibility for conduct of another? Is it the same for facilitation?" The trial court provided the jury with the following written response:

A defendant may be convicted of 1st degree premeditated murder based upon criminal responsibility provided he/she meets the elements for criminal responsibility. It is the State's burden to prove all of the elements of criminal responsibility and 1st degree premeditated murder beyond a reasonable doubt.

Facilitation of a felony is a lesser included offense.

After the appellate record was filed in this case, the Defendant filed a motion to supplement the record with any transcript of the proceedings during which the trial court addressed the jury's question, and this court granted the motion. In response to the order, the trial court entered an order, stating that once the jury submitted the question, the trial court met with defense counsel and the prosecutor, allowed them to read the question, and solicited comments from each attorney before providing a written response. The trial court ordered the court reporter to provide a certificate to this court regarding whether a transcript of the proceedings related to the jury question existed. The court reporter submitted an affidavit, stating that a transcript of the proceedings did not exist. According to the court reporter, the jury submitted a question in writing; the trial court provided a written response; and the trial court did not address the jury in open court regarding the question.

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." *State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). This court reviews the jury instructions in their entirety in determining whether a jury instruction correctly and completely sets forth the applicable law. *Id.* (citing *State v. Guy*, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)); *see State v. Wendell Guinn*, No. W2013-01436-CCA-R3-CD, 2014 WL 3513000, at *7 (Tenn. Crim. App. July 15, 2014). An instruction results in prejudicial error when the instruction, when read as a whole, "fails to fairly submit the legal issues or … misleads the jury as to the applicable law." *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

Trial courts have "the authority to respond to jury questions with a supplemental instruction." *Forbes*, 918 S.W.2d at 451. The "appropriate course of action" for a trial court responding to a jury question is to "bring the jurors back into open court, read the supplemental instruction … along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations." *State v. Bowers*, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). A trial court's failure to follow this procedure is subject to harmless error analysis. *See* Tenn. R. App. P. 36(b); *see also Bowers*, 77 S.W.3d at 791 (concluding that the trial court's failure to read the supplemental instruction to the jury in open court and

- 27 -

to admonish the jury not to place undue emphasis on the supplemental instruction was harmless).

The State acknowledges, and we conclude, that the trial court failed to follow the proper procedure in responding to the jury's question. However, the Defendant bears the burden of establishing that the error was not harmless, and he has failed to explain how the trial court's error "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). Rather, the Defendant maintains that the supplemental jury instruction did not fairly submit the legal issues to the jury and was "subject to more than one interpretation." In making such a challenge, the Defendant views the supplemental jury instruction in isolation. However, we must view the supplemental jury instruction in light of the jury instructions as a whole. *See Brooks*, 277 S.W.3d at 412.

We conclude that there was no ambiguity in the trial court's supplemental instruction when the jury instructions are read as a whole. The jury instructions accurately stated the applicable law. The trial court instructed the jury on the elements of criminal responsibility, first degree premeditated murder, and facilitation. The trial court also instructed the jury that the Defendant could be convicted of first degree murder based upon direct actions by the Defendant or upon a theory of criminal responsibility, that facilitation of first degree premeditated murder is a lesser included offense, and that the jury could not consider lesser included offenses until it had acquitted the Defendant of the charged offense. The supplemental jury instruction did not include a comment on specific evidence presented at trial. While the trial court should have admonished the jury to place no undue emphasis on the supplemental instruction, the main charge to the jury included an instruction that "[t]he order in which instructions are given is no indication of their relative importance. You should not single out one or more of them to the exclusion of others but should consider each one in light of and in harmony with the others." *See Forbes*, 918 S.W.2d at 452 (holding that the trial court's supplemental jury instruction was not reversible error even though the trial court did not admonish the jury to place no undue emphasis upon the supplemental instruction because the primary charge "included an instruction not to single out one instruction over any other").

We conclude that the jury charge, as a whole, did not fail to submit the legal issues and did not mislead the jury as to the applicable law. We further conclude that the trial court's failure to adhere to the proper procedure in responding to the jury's question was harmless. *See* Tenn. R. App. P. 36(b); *see also Bowers*, 77 S.W.3d at 791. Accordingly, the Defendant is not entitled to relief regarding this issue.

## VI. Sentencing

The Defendant maintains that the trial court erred in adopting the original trial judge's findings from the original sentencing hearing rather than making its own independent findings. The Defendant also challenges his sentences as excessive. The State responds that the sentences imposed by the trial court were proper.

During the sentencing hearing following the initial trial, the State presented the testimony of various family members of the victims regarding the impact of the victims' deaths. The State also entered the Defendant's presentence report and judgments of various prior convictions into evidence. According to these exhibits, the Defendant had prior convictions for aggravated robbery, aggravated burglary, driving under the influence (DUI), theft, assault, simple possession of a controlled substance, and possession of drug paraphernalia. He was on probation for a DUI conviction at the time of the offenses, and his probation and other alternative sentences had been revoked on numerous occasions. He also committed numerous disciplinary infractions while incarcerated. The Defendant did not present any proof at the sentencing hearing.

The trial court merged the murder convictions in which Mr. Marsh was the victim, the murder convictions in which Mrs. Marsh was the victim, the two especially aggravated robbery convictions in which Mr. Marsh was the victim, the two especially aggravated robbery convictions in which Mrs. Marsh was the victim, the firearm convictions, and two of the three aggravated arson convictions. The trial court applied the following enhancement factors: (1) the Defendant had a previous history of criminal convictions and behavior, in addition to those necessary to establish the appropriate range; (4) Mr. Marsh was particularly vulnerable "due to his physical disability"; (5) the victims were treated with exceptional cruelty; (8) the Defendant previously had failed to comply with the conditions of a sentence involving release into the community; and (13) he was released on probation at the time of the offenses. T.C.A. § 40-35-114. The trial court did not apply any mitigating factors.

The trial court imposed the mandated sentences of life for each of the first degree murder convictions. The trial court found that the Defendant was a Range II offender and sentenced the Defendant to forty years for each of the especially aggravated robbery convictions, twenty-five years for each of the aggravated arson convictions, and two years for each of the firearm convictions. In imposing partial consecutive sentences, the trial court found that the Defendant had an extensive record of criminal activity, that he was on probation when he committed the offenses, and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. T.C.A. § 40-35-115(b)(2), (4), (6). The trial court ordered the Defendant to serve his sentences consecutively,

- 29 -

except for one of his aggravated arson convictions and his firearm convictions, for a total effective sentence of two terms of life imprisonment plus 105 years.

While this court reversed the Defendant's convictions and dismissed one of his aggravated arson convictions on direct appeal, this court also addressed other issues raised by the Defendant, including the issue of sentencing, "so as not to pretermit his remaining issues." *Foust*, 482 S.W.3d at 25. During his initial appeal, the Defendant only challenged the imposition of consecutive sentencing and did not challenge the length of the sentence for each individual conviction. *Id.* at 55-56. This court concluded that the trial court did not abuse its discretion in imposing partial consecutive sentences based upon its finding that the Defendant had an extensive criminal history and committed the offenses while on probation. *Id.* at 55. The court did not address whether the trial court properly found that the Defendant was a dangerous offender. *Id.* at 55 n.7. This court also rejected the Defendant's argument that his total effective sentence was excessive and was not the least severe measure necessary to achieve the purposes for which the sentence was imposed. *Id.* at 55-56.

Prior to the retrial, the trial judge retired, and another trial judge presided over the Defendant's retrial. After the jury returned its verdicts, the trial court asked the parties whether a new presentence report should be prepared, and both parties agreed that a new report was unnecessary.

During the sentencing hearing, the State announced that its position for sentencing did not differ from its position during the sentencing hearing following the initial trial. The State presented the testimony of various family members of the victims regarding the impact of the victims' deaths. Defense counsel argued that "additional facts" warranted concurrent sentences. Defense counsel argued that evidence presented during the suppression hearing, which was not introduced at the original trial, established that at the time of the offenses, the Defendant was "making a change in his life" in that he was working and enrolled in school.

The Defendant made an allocution in which he maintained that he did not know that Mr. Jones was going to kill the victims. The Defendant stated that Mr. Jones told him that he and Mr. Marsh argued and "got to tussling" and that "[t]hings got out of hand." The Defendant also stated that he would have never allowed "a female to be hurt." He said that at the time of the offenses, he was working, attending school, and caring for his mother. He expressed confusion over the theory of criminal responsibility and maintained that he did not commit the murders. He requested concurrent sentences.

After discussing the theory of criminal responsibility, the trial court stated:

You were part of this. This Court is convinced the proof of your guilt is overwhelming. That you were right in the middle of this. If I was independently sentencing you, which I am, if I were making independent findings of fact, I do adopt what [the original trial judge] found. The Court of Criminal Appeals already affirmed that was an appropriate sentence. I'm going to sentence you in identical fashion.

If I was doing this the first time though, I would sentence you the same way. I'm not going to give you more time than what [the original trial judge] did because I don't think under the law I could. But you are clearly guilty of felony murder of Mr. Marsh. You are clearly guilty of felony murder of Mrs. Marsh, and you are guilty of the other enumerated felonies found within this record.

The especially aggravated robbery of each of these victims as well as the aggravated arson of the structure because you—don't know who threw the match to it, but the proof in this record was that each of these persons, these victims, [was] still alive when you and your co-defendants left that residence. That they died [from] a combination of blunt force trauma and the inhalation of smoke, which shows that they were still breathing when you all left, that you set the house on fire to cover your tracks. To steal a safe with nothing in it, some pills, and a shotgun, that's what these people died for.

The trial court concluded that consecutive sentencing was warranted upon finding that the Defendant had an extensive record of criminal activity and was on probation at the time of the offenses. *See* T.C.A. § 40-35-115(b)(2), (6). The trial court listed the Defendant's prior convictions and found that the sentence was necessary to achieve the purposes of Tennessee Code Annotated section 40-35-115, the statute governing consecutive sentencing.

The trial court imposed the statutorily-mandated sentences of life imprisonment for each of the murder convictions and sentenced the Defendant as a Range II multiple offender to forty years for each conviction of especially aggravated robbery, twenty-five years for each of the especially aggravated arson convictions, and two years for each of the firearm convictions. The trial court merged the murder convictions into two felony murder convictions, the four convictions of especially aggravated robbery into two convictions, the aggravated arson convictions, and the firearm convictions. The trial court ordered the Defendant's sentences to be served consecutively, except for his firearm conviction, for a total effective sentence of two consecutive terms of life imprisonment plus 105 years.

- 31 -

## A. Length of Individual Sentences

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As a Range II offender, the Defendant was subject to a sentence of twenty-five to forty years for especially aggravated robbery and aggravated arson, Class A felonies, and two to four years for possession of a firearm after having been convicted of a felony

involving the use of attempted use of force or violence, a Class E felony. *See* T.C.A. §§ 39-13-403, 39-14-302, 39-17-1307(b)(2) (2010), 40-35-112(b). The trial court imposed the maximum sentence for the especially aggravated robbery convictions and the minimum sentences for the aggravated arson and firearm convictions. The trial court also imposed the statutorily-mandated minimum sentence of life imprisonment for the Defendant's first degree murder convictions. *See* T.C.A. § 39-13-202(c). The Defendant does not challenge his classification as a Range II offender on appeal. Thus, he is not entitled to relief regarding the trial court's imposition of the minimum sentences as a Range II offender for the aggravated arson and firearm convictions. Rather, our review of the Defendant's arguments in his brief are limited to the trial court's imposition of forty-year sentences for the especially aggravated robbery convictions.

The Defendant contends that the trial court failed to make independent findings on the record and erred in adopting the findings of the prior judge from the initial trial. "When the court imposes a sentence, it shall place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." T.C.A. § 40-35-210(e). This court "cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence." *Bise*, 380 S.W.3d at 705 n.41. Although the trial court should set forth sufficient findings to satisfy this court that it has "'considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority,' there is no requirement that such reasoning be particularly lengthy or detailed." *Id.* at 706 (quoting *Rita v. United States*, 551 U.S. 338, 356-57 (2007)). This court may be required to more carefully review the record if the trial court's findings are "less comprehensive." *Id.* However, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Id.*

The record reflects that the trial court independently considered the evidence presented at trial as well as the evidence from the first sentencing hearing and determined that the enhancement factors that the original trial judge applied following the initial trial were still applicable to the Defendant's convictions following the retrial. The Defendant asserts that the trial court erred in adopting the trial court's findings because this court held on direct appeal that some of the evidence presented in the original trial was inadmissible in the retrial. However, the record reflects that the evidence that was improperly admitted in the original trial did not impact the original trial judge's sentencing decision. Rather, the evidence relied upon by the original trial judge also was included in the record on retrial, including the Defendant's criminal history, the Defendant's status as a probationer at the time of the offenses, and Mr. Marsh's particular vulnerability due to his recent surgery. While the Defendant argues that the trial court failed to obtain a new presentence report following the retrial, the Defendant consented to

the trial court's consideration of his prior presentence report, and he did not challenge any of the information included in the report. We conclude that the trial court did not err in adopting the findings of the original trial judge following the trial court's independent review of the facts and circumstances.

The Defendant argues that the trial court erred in not applying any mitigating factors. He maintains that the trial court should have considered testimony that he was employed and attending school at the time of the offenses, as well as the Defendant's allocution in which he asserted that he did not know that Mr. Jones intended to kill the victims. However, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed … within the appropriate range" will be upheld on appeal. *Id.* The record reflects that the trial court considered the purposes and principles of sentencing and the evidence presented at trial and at the sentencing hearing. The Defendant does not challenge the enhancement factors applied by the trial court. We conclude that the trial court did not abuse its discretion in sentencing the Defendant to the maximum sentence within his applicable range for his especially aggravated robbery convictions while sentencing him to the minimum sentences for his aggravated arson convictions.

### B. Consecutive Sentences

The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862. Consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting T.C.A. §§ 40-35-102(1), -103(2)). To impose consecutive sentencing, the trial court must find by a preponderance of the evidence at least one of seven factors listed in Tennessee Code Annotated section 40-35-115(b), which includes: (2) "The defendant is an offender whose record of criminal activity is extensive" and (6) "The defendant is sentenced for an offense committed while on probation."

The Defendant asserts that the trial court simply adopted the findings of the original trial judge in imposing partial consecutive sentences. However, the record reflects that the trial court specifically found that the Defendant had an extensive record of criminal activity and was on probation when the offenses occurred. The trial court set forth the Defendant's numerous convictions as reflected in the presentence report and stated that the Defendant's extensive criminal history was the primary basis upon which it was imposing consecutive sentences. The Defendant does not challenge the application of these two factors but maintains that the trial court failed to consider the principles of sentencing. The trial court found that the sentence was necessary to achieve the purposes of Tennessee Code Annotated section 40-35-115, the statute governing consecutive sentencing. Furthermore, we cannot conclude that the Defendant's total effective sentence is excessive in light of the facts and circumstances of the offenses. Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

We conclude that the trial court erred in ordering the parties to stipulate to the Defendant's prior felony convictions and that the error was not harmless as to the firearm convictions. Accordingly, we reverse the Defendant's firearm convictions and remand for a new trial as to those charges. We otherwise affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE